UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:21-CR-43-HAB |
| | ) | |
| JAMES DARQUAN McCREARY | ) | |

**OPINION AND ORDER**

| Drug Customer: | Hello, is this my drug dealer? |
|---|---|
| Drug Dealer: | Why yes, it is, what can I do for you today? |
| DC: | I would like to order 12 grams of your finest cocaine, a Schedule II controlled substance. I would also like to order a firearm which, due to my prior felony conviction, I cannot legally possess. |
| DD: | Right-o. I have both the cocaine and the firearm here at my residence. They are in my kitchen, where I also have scales, baggies, and other drug-related accoutrements. The price for these illegal items will be $500. |
| DC: | I agree to your price to purchase these illegal items. You know, this purchase violates federal law. What a kick in the pants! |
| DD. | I know! Well, I will bring the items to your home in a vehicle registered in my wife's name. See you soon! |

The foregoing conversation did not occur in this case, or in any other narcotics investigation. Yet, it appears that Defendant believes that such a conversation is necessary before intercepted communications could form the basis for a search warrant of a suspected drug dealer's residence. Because Defendant is mistaken, his motion to suppress (ECF No. 37) is denied.

**I.     Factual Background**

In March 2020, Detective Michael Ross of the JEAN Team Drug Task Force and the Marion Police Department, submitted an affidavit in support of a search warrant application for

Defendant's home[1]. Det. Ross was a ten-year police veteran and had worked "numerous cases involving the investigation of methamphetamine and other illegal narcotic sales and distribution." (ECF No. 41-1 at 2). The four corners of the affidavit set forth the following.

On January 14, 2020, detectives intercepted a telephone call between Corey Harvey ("Harvey") and Clyde Luster ("Luster"). Luster asked Harvey if he wanted "one or two," and Harvey replied that he wanted one. Harvey was then observed driving to meet Luster at a residence in Marion. While Harvey was en route, a black GMC Envoy drove to the same residence. When the Envoy arrived, Luster got into the passenger seat and, after a brief interaction, left the vehicle and returned to the residence. The Envoy was registered to a Linda McCreary. Defendant was later identified as the driver of the Envoy when he was seen exiting the vehicle and entering a restaurant. Based on Det. Ross' "training and experience," he believed the interaction between Luster and Defendant was a drug transaction.

Two months later, detectives intercepted electronic communications between Defendant and Cortez Love ("Love") setting up a meeting between the two men. After the meeting, Love was going to meet with Kenneth Smith ("Smith") to deliver "12." Defendant then asked Love if he wanted "it," believed to be a previously ordered half-ounce of cocaine, and Love confirmed that he did. Detectives observed Defendant leave his residence in the Envoy and drive to Love's residence. Defendant left Love's residence after a short stay. Detectives then followed Love as he left his residence.

Later that day, a text message was sent by Smith to Love requesting "10.7." Detectives interpreted this as a request for another drug deal. This text message was followed by a call from

---

[1] Defendant had been seen coming and going from a residence located at 1003 W. 6th St., Marion, Indiana. It was also observed that Defendant began and ended each day at this location. Det. Ross, then, reasonably assumed that the location was Defendant's residence.

2

Love to Defendant where Love says he needs "a quad and a beezy." The men agree on a $450 price and agree to meet at Love's house.

Soon after, detectives observed Defendant arrive at Love's house in a white Ford Fusion. Defendant exited the vehicle and began walking to the passenger side of Love's vehicle. On the way, he pulled a white substance from his pocket. Defendant then got into the passenger seat of Love's vehicle. Defendant was observed passing something to Love. After some conversation, Defendant was seen pulling an item with "the same shape as a handgun" from the vehicle's center console. After more conversation, Defendant handed the item back to Love. After a few more minutes, Defendant exited Love's vehicle, got back in the Fusion, and left.

Based on Det. Ross' training and experience, he represented that drug dealers often keep drugs at their residence so that they are ready to fill customer orders. He also represented that drug dealers will use safes and lockboxes, cellular telephones, and firearms in their drug trade. Finally, he represented that drug dealers will often deal in a variety of drugs to increase their customer base. As part of the affidavit, Det. Ross "re-affirm[ed]" prior affidavits that had been submitted to the Grant County, Indiana, Superior Court II to obtain wire taps on several individuals, including Love and Defendant.

Based on Det. Ross' affidavit, Judge Dana Kenworthy issued a search warrant for Defendant's residence. When officers executed the warrant, they found twenty-six ounces of cocaine, several loaded pistols, two unloaded rifles, a jar of cocaine cutting agent, and $10,000 in cash, among other items. Defendant was in the residence and was arrested.

II.     **Legal Discussion**

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"

except, "upon probable cause." U.S. Const. Amend. IV; *Missouri v. McNeely*, 569 U.S. 141, 148, (2013). Likewise, once probable cause, supported by "Oath or affirmation," is established, the Fourth Amendment requires the resulting warrant to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The "probable cause" requirement is grounded in the Framers' belief that freedom from government intrusion into one's home was a natural right fundamental to one's liberty. *See Silverman v. United States*, 365 U.S. 505, 511 (1961) (citing *Entick v. Carrington*, 19 Howell's State Trials 1029, 1066) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."). For this reason, to justify such an intrusion, the Fourth Amendment requires "a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In turn, "[t]he particularity requirement 'ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *see also Marron v. United States*, 275 U.S. 192, 196 (1927) ("The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another.").

"A valid search warrant 'require[s] only three things': (1) an independent magistrate issuing it; (2) a showing of probable cause 'that the evidence sought will aid in a particular apprehension or conviction for a particular offense'; and (3) a particular description of 'the things to be seized, as well as the place to be searched.'" *United States v. Gibson*, 996 F.3d 451, 460 (7th

4

Cir. 2021) (citing *Dalia v. United States*, 441 U.S. 238, 255 (1979) (internal quotations and citations omitted)). "Substance matters more than form in this context." *Id*.

Defendant's challenge to the warrant takes two forms. First, he argues that, because detectives "only had suspicions based on circumstantial evidence" that he was a drug dealer, Det. Ross lacked probable cause to believe that Defendant was involved in the drug trade. Using this argument as a springboard, Defendant then argues that there was no probable cause to believe that evidence of drug activity would be found at his home. The Court will address each argument in turn.

With respect to Defendant's status as a drug dealer, Defendant argues that no one on the intercepted communications "explicitly reference[s] illegal narcotics," instead referring to "'plugs,' 'grams,' and planned meetups." (ECF No. 41 at 12). As such, he argues that the evidence gathered was "entirely circumstantial, and not expressly revealing a crime." (*Id*. at 13). Defendant's argument misunderstands the law.

As noted above, participants in the drug trade don't place clear, unambiguous orders[2] specifically naming substances and quantities. They use slang, code words, and other rhetorical devices to conceal the true purposes of their communications. They don't open store fronts with large signs reading "Drugs 'R Us". They use secretive meetings inside vehicles. These "tricks of the trade" are so well known that the Seventh Circuit has described the kind of argument made by Defendant as "frivolous."

> Hall faults his attorney for not arguing that the police lacked probable cause to arrest, but the record demonstrates that this argument would have been frivolous. Chicago police heard Hall yelling "rocks and blow," common slang terms for narcotics, and accepting cash from three different individuals. An experienced officer's firsthand observations of an apparent drug transaction are sufficient to

---

[2] The Court would note that, by expressly referring to "grams," the participants in this drug enterprise were some of the least clandestine individuals the Court has seen.

5

    establish probable cause. Counsel's decision not to frivolously argue otherwise was not unreasonable.

*Hall v. Hulick*, 124 Fed.App'x. 457, 459 (7th Cir. 2005); *see also United States v. Sewell,* 780 F.3d 839, 845-46 (7th Cir. 2015). Both the communications detailed in the affidavit, and the interactions witnessed by detectives, established probable cause to believe that Defendant was involved in drug sales.

    Defendant's argument regarding his home is equally unappealing. Defendant argues that, to connect Defendant's home with illegal activity, the affidavit "relied almost entirely on the affiant's assertion 'that people who deal in illegal narcotics will often keep their illegal narcotics at their residence to be ready for when persons wanting to purchase illegal narcotics contact them.'" (ECF No. 41 at 13). But as the Government notes, this isn't true. Rather, detectives witnessed Defendant leave his home, travel to another location, and complete a suspected drug deal without any stop in between. This observation, taken together with the intercepted communications and the eye-witness accounts of the transactions, sufficiently connected Defendant's home to his drug sales. *United States v. Kelly*, 772 F.3d 1072, 1080 (7th Cir. 2014).

    But even if the only connection between drugs and Defendant's home was Det. Ross' training and experience that drug dealers kept drugs in their home, this would be enough. As Defendant readily concedes, issuing judges are "entitled to take into account the experience of officers whose affidavits explain the significance of specific types of information." *United States v. Lamon*, 930 F.2d 1183, 1189 (7th Cir. 1991). Indeed, the court specifically observed that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *Id*. at 1188.

    Defendant does his best to distinguish *Lamon*, but those attempts fail. His arguments on this front largely hinge on his assertion that there was no probable cause to believe that he was a drug dealer. (*See* ECF No. 41 at 12–13). These arguments have been addressed above. Defendant's

words and actions provided more than enough evidence to establish probable cause that he was involved in drug dealing, making the observation in *Lamon* directly applicable to him.

Probable cause requires only a probability, not certainty, and theoretical possibilities and alternate theories do not necessarily defeat a finding of probable cause. *United States v. Fifer*, 863 F.3d 759, 765 (7th Cir. 2017). Defendant has offered alternative sets of facts that could have put drugs in places other than his home, but those alternatives do not defeat the evidence gathered and presented to the issuing judge. Nothing in Defendant's motion overcomes the "strong presumption of correctness" that this Court must give Judge Kenworthy's decision to issue the warrant. *Morgan*, 537 F. Supp. 3d at 980. Because the Court concludes that there was ample evidence in Det. Ross' affidavit to establish probable cause for the issuance of the warrant, it need not address Defendant's argument related to the incorporation of other affidavits, or the Government's assertion of good faith.

### III.   Conclusion

For these reasons, Defendant's motion to suppress (ECF No. 37) is DENIED.

SO ORDERED on April 15, 2022.

 s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT